UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHANNON MANUS,                          :        Case No. 1:08-cv-243
                                        :
        Plaintiff,                      :        Judge Herman J. Weber
                                        :        Magistrate Judge Timothy S. Black
vs.                                     :
                                        :
COMMISSIONER OF                         :
SOCIAL SECURITY,                        :
                                        :
        Defendant.                      :


**REPORT AND RECOMMENDATION[1] THAT: (1) THE ALJ'S NON-
DISABILITY FINDING BE FOUND NOT SUPPORTED BY SUBSTANTIAL
EVIDENCE, AND REVERSED; (2) THIS MATTER BE REMANDED TO THE
ALJ UNDER THE FOURTH SENTENCE OF 42 U.S.C. § 405(g); AND
(3) THIS CASE BE CLOSED**


        This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore

unentitled to disability income benefits ("DIB") and supplemental security income ("SSI").

(*See* Administrative Transcript ("Tr.") (Tr. 14-25) (ALJ's decision)).

---

        [1] Attached hereto is a NOTICE to the parties regarding objections to this Report and
Recommendation.

**I.**

On March 23, 2005, Plaintiff filed an application for disability insurance benefits alleging a disability onset date of June 1, 2004,[2] due to degenerative disc disease, spondylolisthesis, obesity, depression, pain disorder, and borderline intellectual functioning. (Tr. 81, 100, 367).

Upon denial of her claims on the state agency levels, Plaintiff requested a hearing *de novo* before an ALJ. A hearing was held on July 10, 2007, at which Plaintiff appeared with counsel and testified. (Tr. 14). A vocational expert, Mr. William T. Cody, was also present and testified. (*Id.*)

On August 9, 2007, the ALJ entered his decision finding Plaintiff not disabled. (Tr. 25). That decision became the final determination upon denial of review by the Appeals Council. (*Id.*)

Plaintiff was 35 years old at the time of her hearing. She has an eighth grade education and never obtained a GED. (Tr. 34). Plaintiff has worked as a nurse assistant and a telemarketer. (Tr. 53).

---

[2]     An SSA Field Office disability report recommended an onset date of September 1, 2004, explaining that Plaintiff worked full time until June 1, 2004, continued working through August 2004, and was terminated by her employer on September 15, 2004. (Tr. 96-99). At the ALJ hearing, Plaintiff's counsel requested that the onset of disability be amended to September 15, 2004, and the ALJ granted this request. Plaintiff is insured through December 31, 2009. Therefore, Plaintiff must establish disability as of on or before that date in order to be entitled to a period of disability and DIB.

The ALJ's "Findings," which represent the rationale of his decision, were as
follows:

1.  The claimant meets the insured status requirements of the Social
    Security Act through December 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since June 1,
    2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*,
    416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: lumbosacral
    degenerative disc disease and spondylolisthesis that is status-post a
    November 2005 decompressive laminectomy and anterior interbody fusion;
    obesity; depression; a pain disorder; and borderline intellectual functioning
    (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments
    that meets or medically equals one of the listed impairments in 20 CFR Part
    404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.925 and
    416.926).

5.  After careful consideration of the entire record, the undersigned finds that
    the claimant has the residual functional capacity to lift/carry/push/pull 10
    pounds occasionally and five pounds frequently. She can stand and/or walk
    for two hours in an eight-hour workday, but can do so for no more than 20
    minutes at a time. She must then be allowed to sit for five minutes. She
    can sit for one hour at a time, but must then be able to stand for 2-3 minutes.
    She can stoop, kneel, crouch, and climb ramps only occasionally. She is
    unable to crawl, to climb ladders, rope or scaffolds, or to perform work
    requiring the forceful use of either lower extremity. She is unable to work
    at unprotected heights or to work around hazardous machinery. The
    claimant is able to perform only simple, routine, repetitive tasks. She can
    understand, remember, and carry out only short and simple instructions.
    She cannot interact with the general public, and can interact with coworkers
    and supervisors only on an occasional basis. The claimant is able to make
    only simple work-related decisions. Any job the claimant could perform
    should not require more than ordinary and routine changes in the work
    setting or duties. Any job the claimant could perform should not require
    more than simple reading, simple writing, or simple math.

6.  The claimant is unable to perform any past relevant work (20 CFR § 404.1565 and 416.965).

7.  The claimant was born on January 4, 1972, and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR § 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-24).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB or SSI. (Tr. 25).

On appeal, Plaintiff argues that: (1) the ALJ erred because his reasons for rejecting the opinion of Ms. Satterthwaite, Plaintiff's treating therapist, were not based on substantial evidence; (2) the ALJ erred in not obtaining an updated medical expert opinion regarding medical equivalency as required by SSR 96-96; (3) the ALJ erred by giving inadequate consideration to Plaintiff's credibility even though her testimony was

supported by medical records; (4) the ALJ erred by failing to give controlling weight to Plaintiff's treating physician in violation of 20 CFR 404.1527d and Social Security Ruling 96-2p (1996); and (5) the ALJ erred by relying on an improper hypothetical to the vocational expert that does not constitute substantial evidence of the Plaintiff's vocational abilities.  (Doc. 8 at 1-2).

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts.  If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

For her first assignment of error, Plaintiff claims that the ALJ erred because its reasons for rejecting the opinion of Ms. Satterthwaite, Plaintiff's treating therapist, were not based on substantial evidence.

The record is replete with evidence of Plaintiff's mental health issues:

In an office note dated March 3, 2004, Plaintiff's primary care physicians indicated that she complained of lack of ambition, moodiness, and difficulty sleeping. (Tr. 153). Plaintiff was diagnosed with depression and prescribed Paxil. (*Id*.)

In an office note dated September 14, 2004, Plaintiff's primary care physicians reported that she experienced feelings of depression after she stopped taking the medication Lexapro. (Tr. 159).

At the request of the state agency, Plaintiff attended a psychological consultative evaluation with David Chiappone, Ph.D., on May 4, 2005. (Tr. 188-191). Plaintiff reported that she left school in the eighth grade to help her mother care for her younger sister. (Tr. 188). Plaintiff noted that she made poor marks in regular classes and was held

back at times. (Tr. 188). With respect to household chores, Plaintiff reported that she could do chores in a piecemeal manner. (Tr. 189). Plaintiff put the laundry in but did not remove it, she did little cooking, and she did the dishes while seated on a stool. (*Id.*) On a scale of one to 10, with 10 being severe, Plaintiff rated her depression as a 10 at that time. (Tr. 189). Plaintiff reported that her sleep was broken, she had reduced energy, and had lost interest in most activities. (*Id.*) Dr. Chiappone noted that Plaintiff had received steroid injections for a back condition and may have surgery in the future. (Tr. 190).

Dr. Chiappone reported that Plaintiff exhibited pain behaviors during his evaluation, specifically noting that she complained of pain and seemed uncomfortable sitting for the duration of the evaluation. (Tr. 189). He noted that she came across as being depressed and concerned about her health. (*Id.*) Dr. Chiappone noted that she put forth the effort and persistence and did not appear to be malingering. (*Id.*) He stated that she appeared to be in the borderline range of intellect. (*Id.*)

Dr. Chiappone noted that Plaintiff was able to concentrate and attend adequately during his evaluation but stated that she has to be considered at least mildly impaired in that area in terms of ability to concentrate and attend over time any worksite as a result of her pain. (Tr. 190). Dr. Chiappone indicated that she was mildly impaired in her ability to relate to co-workers, supervisors, and the public, stating that she related adequately during the evaluation but indicated her pain and depression would interfere. (*Id.*) Dr. Chiappone found that Plaintiff was moderately impaired in her ability to carry out and

persist over time as a result of her pain and depression and also noted she has moderately

reduced stress tolerance. (*Id*.) Dr. Chiappone diagnosed pain disorder due to both

psychological factors and general medical condition, dysthymia, and borderline

intellectual functioning. (*Id*.) Dr. Chiappone assigned a GAF score of 55.[3] (*Id*.)

Plaintiff first saw therapist Lora Satterthwaite, MSW,[4] LSW,[5] on October 20, 2005.

(Tr. 279). Ms. Satterthwaite reported that Plaintiff had been depressed for years and

currently had major medical problems that prevented her from working, and as a result

prevented her and her children from moving out of the house they shared with her ex-

husband. (Tr. 275). Ms. Satterthwaite reported that Plaintiff had limited judgment and

insight and provided a diagnosis of major depressive disorder, recurrent. (Tr. 278).

In a treatment note dated October 27, 2005, Ms. Satterthwaite indicated that Plaintiff

had an eighth-grade education and had asked if they could review low income materials

during their next session. (Tr. 280).

In a treatment note dated November 5, 2005, Ms. Satterthwaite noted that Plaintiff

had a depressive affect and was tearful when discussing her relationship with her ex-

---

[3] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. A score of 51-60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning.

[4] A MSW (master of social work) is considered a terminal degree in the field of clinical social work. It requires two years of graduate study, in combination with two years (900 hours) of internship, also called field experience.

[5] A LSW (licensed social worker) has obtained a professional degree in social work and is professionally registered.

husband. (Tr. 284). In office notes dated November 10, 17, and 19, 2005, Plaintiff expressed anxiety and fear over her upcoming back surgery. (Tr. 285-87). In an office note dated January 26, 2006, Ms. Satterthwaite reported that Plaintiff was doing much better physically and called her back surgery a success. (Tr. 288). Plaintiff still reported difficulty interacting with her ex-husband and discussed an incident in which she was driving and wanted to drive her car off the road. (*Id.*) Plaintiff made a verbal contract not to hurt herself. (*Id.*) In an office note dated February 2, 2006, Ms. Satterthwaite noted that Plaintiff appeared both very down and anxious. (Tr. 289). In a treatment note dated February 23, 2006, Ms. Satterthwaite reported that Plaintiff stated her depression was unbearable. (Tr. 291).

On February 24, 2006, Ms. Satterthwaite completed mental RFC forms at the request of Plaintiff's counsel. (Tr. 262-278). When asked to describe the clinical findings that demonstrate the severity of the mental impairment and symptoms, Ms. Satterthwaite noted the following: suicidal ideation; impaired judgment; offers little insight; few social supports; racing thoughts; and, depressed mood. (Tr. 262). Ms. Satterthwaite also identified additional signs and symptoms, such as blunt, flat or inappropriate affect, intense and unstable interpersonal relationships, impulsive and damaging behavior, easy distractibility, and sleep disturbance. (Tr. 263). Ms. Satterthwaite opined that Plaintiff would be unable to meet competitive standards with respect to all but one of the mental abilities and aptitudes needed to do unskilled work, stating that due to her recent major surgery, she was unable to sit, stand or focus for

more than an hour at a time.  (Tr. 264).

Ms. Satterthwaite indicated that Plaintiff's psychiatric condition exacerbates her experience of pain or other physical symptoms.  (Tr. 265).  Ms. Satterthwaite stated that Plaintiff had marked restriction of activities of daily living, marked difficulties maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, or pace.  (*Id.*)  Ms. Satterthwaite estimated that Plaintiff's impairments or treatment would cause her to miss more than four days of work per month.  (Tr. 267). Ms. Satterthwaite stated that Plaintiff's major medical health issues were an important aspect of her mental health functioning, indicating that her mental health issues were not going to decrease until her physical pain and discomfort were under control.  (*Id.*)  When asked if Plaintiff had experienced affective changes, Ms. Satterthwaite reported that her suicidal ideation had gotten more intense in the past six months.  (Tr. 269).  When asked to note areas in which Plaintiff had exhibited marked or extreme difficulties concerning activities of daily living, Ms. Satterthwaite indicated the following: shopping; cooking; cleaning; planning daily activities; and, initiating and participating in activities independent of supervision and direction.  (Tr. 271).  With respect to social functioning, Ms. Satterthwaite reported that Plaintiff had exhibited marked or extreme difficulty with the following: communicating clearly and effectively; getting along with family; getting along with friends; ability to initiate social contact; establishing interpersonal relationships; and, holding a job.  (Tr. 271-72).

In a note dated May 25, 2006, Ms. Satterthwaite reported that Plaintiff came in for her session in positive spirits. (Tr. 297). During their next session on June 1, 2006, Ms. Satterthwaite noted that Plaintiff was in a bad emotional place when she arrived for their appointment. (Tr. 299). Plaintiff stated that her doctor told her she needed to lose weight but she was unable to exercise in light of her physical condition. (*Id*.) Plaintiff also expressed concern over her father's medical coverage and issues involving plans to visit a daughter who had been adopted out and currently lived in Arizona. (*Id*.)

In a note dated June 15, 2006, Ms. Satterthwaite noted that Plaintiff looked very haggard and depressed, and Plaintiff reported she had been sad with suicidal thoughts but did not have a current plan. (Tr. 298). Plaintiff reported being in physical pain that week. (*Id*.) In a note dated June 29, 2006, Ms. Satterthwaite reported that Plaintiff was depressed, presented with a flat affect, and had to be encouraged to talk during the session. (Tr. 364). On July 27, 2006, Plaintiff told Ms. Satterthwaite about an argument with her ex-husband in which she became so angry that she hit him as he came towards her. (Tr. 361). In a note dated August 17, 2006, Ms. Satterthwaite indicated that Plaintiff was upset over an incident involving her mother after which she spent most of the day crying. (Tr. 359). In a note dated August 24, 2006, Ms. Satterthwaite reported that Plaintiff was in a very depressed state of mind when she came in for her session, again over issues concerning her mother. (Tr. 358).

On October 16, 2006, Plaintiff attended a psychological evaluation with Mary Jane Kocian-Figueroa, Psy.D., at the request of the Butler County Department of Job and

Family Services.  (Tr. 301-02).  During the evaluation, Plaintiff reported that she could

not manage money or process information.  (Tr. 302).  Plaintiff indicated she was unable

to learn, noting that she tried to get her GED but was unsuccessful.  (*Id*.)  Plaintiff

reported thinking about suicide regularly, crying often, and isolating herself.  (*Id*.)  She

reported that she is dependent on others for most daily activities.  (*Id*.)  Dr. Kocian-

Figueroa recommended that Plaintiff undergo neuropsychological testing for a complete

evaluation to assess IQ, memory, achievement, executive reasoning,

concentration/attention, and personality.  (*Id*.)

Dr. Kocian-Figueroa opined that Plaintiff would have marked limitations with

respect to the following mental abilities: ability to carry out detailed instructions; ability

to maintain attention and concentration for extended periods; ability to perform activities

within a schedule, maintain regular attendance, and be punctual within customary

tolerances; ability to work in coordination with or proximity to others without being

distracted by them; and, ability to accept instructions and respond appropriately to

criticism from supervisors.  (Tr. 301).  Dr. Kocian-Figueroa indicated that Plaintiff would

be extremely limited with respect to her ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at

a consistent pace without an unreasonable number and length of rest periods.  (*Id*.)

In a note dated November 2, 2006, Ms. Satterthwaite reported that Plaintiff

appeared to be down but denied any suicidal ideation.  (Tr. 353).  In an office note dated

November 16, 2006, Ms. Satterthwaite noted that it had been a year since Plaintiff

underwent back surgery and stated that she was still unable to sit for long periods of time. (Tr. 352).  On December 19, 2006, Ms. Satterthwaite reported that Plaintiff appeared to be down and presented with a flat affect.  (Tr. 350).  In a note from February 2007, Ms. Satterthwaite reported that Plaintiff's mood and affect were notably sad.  (Tr. 348). On March 3, 2007, Ms. Satterthwaite reported that Plaintiff was in a lot of physical pain due to her bad back and indicated she presented as very depressed.  (Tr. 347).  Plaintiff reported that she felt a major anxiety attack coming on one evening when all of her children were out of the house and she had to call her daughter to return home.  (*Id*.)  On March 17, 2007, Ms. Satterthwaite stated that Plaintiff presented as anxious and indicated her speech was rapid at times.  (Tr. 346).  In a note dated April 7, 2007, Ms. Satterthwaite noted that Plaintiff's mood/affect was notably depressed and stated that she exhibited irrational fears over an upcoming trip to Arizona to visit her daughter.  (Tr. 343). Ms. Satterthwaite also reported that Plaintiff was experiencing increased stress, which caused her suicidal ideation to escalate.  (*Id*.)

On May 5, 2007, Ms. Satterthwaite reported that Plaintiff experienced a lot of pain recently, especially with prolonged sitting.  (Tr. 341A).  Plaintiff reported plans to move to Arizona after visiting her daughter there for three days.  (*Id*.)  Ms. Satterthwaite indicated that her mood/affect was anxious and she presented as being fixated on moving to Arizona without much consideration for others.  (*Id*.)  On June 2, 2007, Ms. Satterthwaite noted that Plaintiff still had some back problems, which Plaintiff stated she would always have.  (Tr. 340).  Ms. Satterthwaite reported that Plaintiff had an upbeat

mood and she noted an improvement in ability to do things for herself. (*Id.*)

In a letter to Plaintiff's counsel dated June 28, 2007, Ms. Satterthwaite reported that Plaintiff continued to struggle both emotionally and physically and stated it was her professional opinion that Plaintiff should not be forced back into a work setting due to these stressors, as this would be detrimental to her overall well-being. (Tr. 339).

Plaintiff claims that the ALJ improperly discounted the opinion of Ms. Satterthwaite. As a licensed social worker, Ms. Satterthwaite is considered an "other [non-medical] source." *See* 20 C.F.R. § 404.1513 (1997). The Sixth Circuit has previously held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as a social worker. *See, e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997).

However, a recent Social Security Ruling controls the analysis. SSR 06-03P was issued effective August 9, 2006, and it clarifies how to consider opinions and other evidence from sources who are not "acceptable medical sources." SSR 06-03P, 2006 SSR LEXIS 5. While the ruling notes that information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* at *3. The ruling goes on to note that:

> With the growth of managed health care in recent years and the
> emphasis on containing medical costs, medical sources who are not
> "acceptable medical sources," such as . . . *licensed clinical social
> workers* have increasingly assumed a greater percentage of the
> treatment and evaluation functions handled primarily by physicians

and psychologists. Opinions from these medical sources who are not technically deemed "acceptable medical sources," under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.

*Id.* at *4 (emphasis added). Further, the ruling explains that opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors, including how consistent the opinion is with other evidence and how well the source explains the opinion. *Martin v. Barnhart*, 470 F. Supp. 2d 1324, 1328-29 (D. Utah 2006) (citing SSR 06-03P, 2006 LEXIS 5 at *5-6). Finally, the ruling states that:

Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, 2006 SSR LEXIS at *7. Following SSR 06-03P, the ALJ was required to discuss the factors relating to his analysis of Ms. Satterthwaite's assessment, so as to have provided a proper basis for rejecting her opinion.

The ALJ stated that

"[l]ittle weight is given to the opinions of Lora Satterthwaite, who is the claimant's therapist . . . Her opinion . . . that the claimant should receive Disability benefits is conclusory, and has no cited objective support . . . She stated that the claimant should not be forced back into a work setting due to emotional and physical stressors, yet noted in the same month that her

mood was upbeat . . . Her notes do show depression, but
mostly involve problems with her relationships with her ex-
husband and children.  The notes do not show a consistent
disabling level of depression."

(Tr. 22).

The ALJ's explanation fails to provide a proper basis for rejecting

Ms. Satterthwaite's findings as required by SSR 06-03P.  Specifically, the ALJ fails to

address the fact that Ms. Satterthwaite saw Plaintiff on a *weekly* basis from October 20,

2005 through February 24, 2006, significantly more than any other medical examiner.

(Tr. 262-67).  Additionally, Ms. Satterthwaite's opinion is consistent with Dr. Kocian-

Figueroa.  (Tr. 300-01).  Moreover, it appears that in rejecting Ms. Satterthwaite's

findings, the ALJ improperly formed his own medical opinion, determining, for example,

that because Plaintiff was depressed during one session, and in the same month

demonstrated a "pleasant mood," that she was not depressed.  (Tr. 22).  The ALJ also

discredits Plaintiff's depression because it stemmed from "problems with her

relationships with her ex-husband and children."  (*Id*.)  Such a finding clearly indicates

that the ALJ inserted his own non-medical opinion as to what defines depression, and

what stressors appropriately cause depression.  This was clear error.

The undersigned does not dispute that it is the ALJ's prerogative to resolve

conflicts and weigh the evidence of record.  However, it appears, in making this

determination, the ALJ, in part, impermissibly acted as his own medical expert.  *See*

*Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir. 1985); *Kent v. Schweiker,* 710 F.2d 110,

-16-

115 (3d Cir. 1983); *Lund v. Weinberger,* 520 F.2d 782, 785 (8th Cir. 1975). While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, he is not permitted to make his own evaluations of the medical findings. *See McBrayer v. Sec'y of Health & Human Servs.,* 712 F.2d 795, 799 (2d Cir. 1983); *Filocomo v. Chater,* 944 F. Supp. 165, 170 (E.D.N.Y. 1996).

It is clearly established law that the opinion of a non-treating "one-shot" consultative physician or of a medical advisor cannot constitute substantial evidence to overcome the properly supported opinion of a physician who has treated a claimant over a period of years. *Lashley v. Sec'y of Health & Human Sers.*, 708 F.2d 1048, 1054 (6th Cir. 1983). While the undersigned acknowledges that Ms. Satterthwaite is not a physician, her opinion as a licensed social worker who has treated Plaintiff on a weekly basis for more than a year is "important" nonetheless, and entitled to significant weight. SSR 06-03p at *4. In fact, considering her extensive treating relationship with Plaintiff, it appears that Ms. Satterthwaite is in the best position to give an opinion as to Plaintiff's limitations.

Accordingly, the undersigned finds that the ALJ improperly weighed the medical evidence, and failed to give sufficient justification for rejecting Ms. Satterthwaite's findings. Therefore, the undersigned finds that this matter should be remanded for further fact finding in order to obtain a medical expert to reevaluate the weight to be given to the opinion of Ms. Satterthwaite and to provide an accurate RFC assessment.

**B.**

For her second assignment of error, Plaintiff claims that the ALJ erred because he did not obtain an updated medical expert opinion regarding medical equivalency as required by SSR 96-6p.

SSR 96-6 provides that the ALJ should obtain an updated medical opinion from a medical expert when additional medical evidence is filed that could modify the state agency medical consultants finding that the impairment(s) was not equivalent in severity to any impairment(s) documented in the Listing of Impairments.

As previously stated, Dr. Chiappone examined Plaintiff at the request of the state agency on May 4, 2005. (Tr. 188-191). Joan P. Williams, Ph.D, reviewed the medical evidence and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity ("MRFC") form at the request of the state agency on May 18, 2005. (Tr. 192-209). Dr. Williams concluded that Plaintiff had no significant limitations with respect to any of the mental activities listed on the MRFC (Tr. 192-194), and she found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and had no episodes of decompensation. (Tr. 206). Dr. Williams noted that she rated the "B" criteria of the Listings under the following specific Listings: 12.04 (dysthymia per psychological consultative exam); 12.05 (borderline intellectual functioning per psychological consultative exam); and, 12.07 (pain disorder with psychological and general medical condition per psychological consultative exam). (Tr.

196-206). Patricia S. Semmelman, Ph.D., reviewed the evidence of record and affirmed Dr. Williams' assessments on July 18, 2005. (Tr. 192-209).

However, when Drs. Williams and Semmelman reviewed the medical file at the request of the state agency, the only medical records addressing any psychological impairments were records from Plaintiff's primary care physicians which contained brief notations addressing Plaintiff's depressive symptoms and documented that she was prescribed antidepressant medication, and Dr. Chiappone's psychological consultative exam report dated May 4, 2005. Plaintiff did not begin treatment with therapist Lora Satterthwaite until October 2005, three months after Dr. Semmelman affirmed the assessment completed by Dr. Williams in May 2005. Subsequent to Dr. Semmelman's review of the file in July 2005, progress notes from Ms. Satterthwaite from October 20, 2005 to June 28, 2007 were added to Plaintiff's file.

In addition, Ms. Satterthwaite completed MRFC forms that suggested Plaintiff's impairments met or equaled Listing 12.04 and/or Listing 12.07 in severity. Specifically, Ms. Satterthwaite indicated that Plaintiff had marked restriction of activities of daily living, marked difficulties maintaining social functioning, and extreme difficulties in maintaining concentration, persistence or pace. (Tr. 265). Further, Plaintiff was evaluated by Dr. Kocian-Figueroa at the request of the Butler County Department of Job and Family Services on October 16, 2006. Dr. Kocian-Figueroa's MRFC assessment noted that Plaintiff was markedly limited with respect to several mental abilities and was extremely limited with respect to the ability to complete a normal workday and workweek

without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 300-01).

In his evaluation report dated May 4, 2005, Dr. Chiappone noted that Plaintiff drove on occasion and denied having panic attacks. (Tr. 189). Ms. Satterthwaite and Dr. Kocian-Figueroa, however, both reported that Plaintiff experiences panic attacks. In addition, Plaintiff testified that she no longer drives because she has panic attacks, and she also stated that she did not have any friends or go anywhere because she cannot handle being around people. (Tr. 46).

Defendant claims that the ALJ did not obtain an updated medical opinion about Plaintiff's mental condition because evidence received since state agency psychologists provided their opinions (*i.e.*, medical records from Ms. Satterthwaite and Dr. Kocian-Figueroa) did not show any significant additional mental limitations. (Doc. 12 at 12). The undersigned disagrees.

Both Ms. Satterthwaite and Dr. Kocian-Figueroa found that Plaintiff had marked limitations with respect to her mental and social functioning and abilities to complete a normal workday and workweek. (Tr. 265, 300-01). Therefore, the undersigned finds that this matter should be remanded for further fact finding in order for a medical expert to review the records of Ms. Satterthwaite and Dr. Kocian-Figueroa, because such additional medical evidence could certainly modify the findings of state agency medical consultants.

## C.

For her fourth assignment of error, Plaintiff claims that the ALJ erred by failing to give controlling weight to her treating physician.

The record evidence shows that:

Plaintiff first complained of back pain during an office visit with her primary care physician on June 15, 2004. (Tr. 158). Plaintiff indicated that she worked at a hospital and was required to lift patients, and she stated that her lower back started to hurt while she was at work. (*Id*.) Physical examination revealed tender lumbar paraspinal muscles and some tenderness in the right hip region. (*Id*.) The initial diagnosis was back strain. (*Id*.) An x-ray of the lumbosacral spine dated March 3, 2005 showed bilateral spondylosis with Grade I spondylolisthesis of L5 on S1 and incomplete posterior fusion at L5. (Tr. 175).

On March 7, 2005 Plaintiff saw William Ross, D.O., for an orthopedic consultation. (Tr. 312). Plaintiff rated her pain a 9 on a scale of 1 to 10. (*Id*.) Upon physical examination, Dr. Ross noted some midline tenderness at L4 and L5 and pain with extension. (*Id*.) Dr. Ross diagnosed acute lumbar pain/sprain with bilateral L5 spondylosis with L5 S1 spondylolisthesis. (*Id*.) An MRI of the lumbar spine dated March 11, 2005 showed chronic and lateral L5 spondylosis with minimal grade I anterolisthesis at L5-S1 and minimal degeneration of the L5- S1 disc. (Tr. 176).

Plaintiff first saw Mohammad R. Khan, M.D., on July 15, 2005. (Tr. 223). Dr. Khan reported that epidural injections and therapy improved Plaintiff's chronic back

pain to a certain degree, but she continued to have pain. (*Id.*) In his notes, Dr. Khan marked the box indicating an abnormal musculoskeletal examination, specifically noting tenderness and the thoracic and lumbosacral spine area with no neurological deficit noted. (*Id.*)

On August 12, 2005, Dr. Khan completed an arthritis RFC Questionnaire at the request of Plaintiff's counsel. (Tr. 219-222). Dr. Khan reported that Plaintiff had the following side effects to her medications that may have implications for working: dizziness; lightheadedness; fatigue; nervousness; and, nausea. (Tr. 220). Dr. Khan indicated that Plaintiff could sit for 15 minutes at one time and stand for 15 minutes at one time before needing to change positions and could stand/walk for less than two hours total in an eight hour working day. (Tr. 200-21). Dr. Khan stated that Plaintiff would need a job that permitted shifting positions at will from sitting, standing or walking and noted that Plaintiff could never lift over 10 pounds. (Tr. 221). Dr. Khan estimated that Plaintiff would miss more than four days of work per month as a result of impairments or treatment. (Tr. 222).

In an office note dated August 15, 2005, Dr. Khan again marked the box indicating abnormal findings upon musculoskeletal examination, specifically noting tenderness in the thoracic and lumbosacral spine area with no neurodeficit noted. (Tr. 236). In an office note dated October 10, 2005, Dr. Khan again marked the box indicating abnormal findings upon musculoskeletal evaluation but he did not list specific findings. (Tr. 237).

Plaintiff saw Arthur Arand, M.D., for a neurosurgical consultation on October 18, 2005. (Tr. 245-49). Plaintiff reported that the severity of her low back pain ranged from moderate to severe and radiated into both legs. (Tr. 245). Plaintiff rated the pain a 10 on a scale in which a 0 meant no pain and a 10 meant unbearable pain. (Tr. 241). Dr. Arand noted that Plaintiff had four epidural steroid injections and participated in physical therapy but received only temporary relief. (Tr. 245). Physical examination revealed tenderness with lumbar palpation/inspection and lumbar subluxation. (Tr. 247). Strength and tone were reported as normal in both the upper and lower extremities. (*Id.*) Dr. Arand indicated that the plan was to proceed with an L5-S1 anterior lumbar interbody fusion. (Tr. 248).

On November 21, 2005, Plaintiff underwent an interior lumbar interbody fusion and posterior decompressive laminectomy at L5-S1 with medial facetectomy and foraminotomy, and posterior lateral fusion and pedicle screw fixation L5-S1. (Tr. 227-231). In a phone note dated November 28, 2005, Plaintiff's primary care physicians reported that she had called after undergoing back surgery and indicated that Dr. Arand wanted their office to take care of pain management and order medications, which they confirmed with Dr. Arand's office. (Tr. 325).

In an office note from a post-operative visit on December 12, 2005, Dr. Arand noted that Plaintiff had been compliant with post-operative instructions. (Tr. 256). Dr. Arand noted her activity level was showing improvements and her symptoms were much improved. (*Id.*) Upon physical examination, Dr. Arand noted tenderness with

lumbar palpation/inspection. (Tr. 257). Dr. Arand stated that Plaintiff could return to sedentary work on January 16, 2006 with the following restrictions: no lifting greater than 10 pounds; occasional lifting and/or carrying articles or small tools; no more than four hours per day; and, permission to stand every hour as needed for comfort. (Tr. 259).

In an assessment signed by physical therapist Mark Lyle, MSPT, on January 4, 2006, he reported that Plaintiff experienced some improvement in her symptoms since her surgery, but that she continued to have intermittent right lower extremity symptoms in the front and back of her leg and continued to have some numbness with sitting greater than 20 to 30 minutes. (Tr. 334). Physical examination revealed mildly decreased L5-S1 dermatomes on the right. (*Id*.)

During an office visit with her primary care physician on February 2, 2006, Plaintiff reported some improvements in her low back pain but still complained of right hip and upper leg pain. (Tr. 321). Physical examination revealed tenderness in the right hip area. (*Id*.)

On February 28, 2006, Plaintiff was evaluated by Dana Brown, a nurse practitioner with Dr. Arand's office. (Tr. 331-333). Ms. Brown indicated that Plaintiff had been compliant with postoperative instructions and noted she had shown improvements in her symptoms and activity level. (Tr. 331).

During an office visit with her primary care physician on May 30, 2006, Plaintiff complained of pain in her hips and legs, but it is unclear whether any physical exam was done that day. (Tr. 319). During an office visit for primary care physician on November

7, 2006, Plaintiff complained of back pain and stated the pain medication was not working. (Tr. 317). The examining physician checked the box indicating the exam of the back/spine was abnormal, although specific abnormalities are not clear in the doctor's handwritten notes. (*Id.*)

The regulations state that the findings of the treating physicians as to the severity of an impairment should be accorded controlling weight if they are well supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. (*See* 20 C.F.R. § 404.1527(d)(2), §416.927(d)(2)). Even if an ALJ does not find that a treating physician's opinion is entitled to controlling weight, he must consider the factors set forth in evaluating any medical source opinion. (*See also* 20 C.F.R. § 416.927(d)). These factors are the length of treatment, frequency of examination, nature and extent of treatment relationship, support of the opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating physician. (*Id.*) The ALJ is required to consider the factors listed in the regulations when evaluating any medical source opinion, treating or otherwise. (*Id*; *see also* Social Security Rulings 96-2p, 96-5p).

Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Khan, her treating physician. (Tr. 379). The ALJ explained that he did not rely on Dr. Khan's opinion because he only saw Plaintiff three times and his notes of those examinations did not contain any significantly abnormal findings. (Tr. 22, 223). Additionally, he found that Dr. Khan did not cite any objective medical findings. (Tr. 22, 218-23). Specifically, the

ALJ points out that epidurals allegedly helped Plaintiff "a lot." (Tr. 236).

However, the ALJ was incorrect in finding that Dr. Khan's notes did not contain any objective medical support. (Tr. 22). As discussed above, Dr. Khan had the opportunity to examine Plaintiff three times. While his office notes are not terribly detailed, he did indicate abnormal exam findings and on at least two occasions provided more detailed information concerning his objective findings of musculoskeletal tenderness upon physical examination. Moreover, the fact that epidurals helped Plaintiff's pain does not indicate that they alleviated her pain in such a way as to contradict Dr. Khan's findings. Therefore, the ALJ erred in failing to properly analyze Dr. Khan's opinion using the factors set forth in 20 C.F.R. § 404.1527(d).

Accordingly, the undersigned finds that this matter should be remanded for further fact finding in order to obtain a medical expert to reevaluate the weight to be given to Dr. Khan and to provide an accurate RFC assessment.

**D.**

For her fifth and final assignment of error, Plaintiff claims that the ALJ erred by relying on an improper hypothetical to the vocational expert.

The Commissioner may rely upon a vocational expert's answer to a hypothetical question only if substantial evidence supports the assumptions included in the hypothetical question. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). The ALJ gave little weight to the opinions of Ms. Satterthwaite, Dr. Khan, Dr. Arand, and Dr. Kocian-Figueroa. Both Dr. Khan and Dr. Arand would

have limited Plaintiff to less than eight hours of work per day. (Tr. 219-222, 259). Both

Dr. Khan and Ms. Satterthwaite estimated that Plaintiff would miss more than four days

of work per month as a result of her impairments or treatments. (Tr. 222, 267). In

response to questions by Plaintiff's counsel, the vocational expert indicated that if either

Ms. Satterthwaite or Dr. Kocian-Figueroa's opinions were assumed to be accurate, then

Plaintiff would be unable to work. (Tr. 33).

As a result, the ALJ erred in relying upon the hypothetical given to the vocational

expert that failed to include any of the limitations set forth by Ms. Satterthwaite,

Dr. Khan, Dr. Arand, and Dr. Kocian-Figueroa.

The undersigned finds that the ALJ's questioning of the vocational expert did not

accurately portray the Plaintiff's impairments, in particular the findings that limited

Plaintiff to less than eight hours of work per day and estimated that she would miss more

than four days of work each month. As noted above, in rejecting these findings, it

appears that the ALJ impermissibly acted as his own medical expert.

Accordingly, further fact-finding is necessary.

## III.

A sentence four remand provides the required relief in cases where there is

insufficient evidence in the record to support the Commissioner's conclusions and further

fact-finding is necessary. *See Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171,

174 (6th Cir. 1994) (citations omitted). In a sentence four remand, the Court makes a

final judgment on the Commissioner's decision and "may order the Secretary to consider

evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher,* 17 F.3d at 175. "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Culbertson v. Barnhart,* 214 F. Supp. 2d 788, 795 (N.D. Ohio 2002) (*quoting Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551 (6th Cir. 1984)).

## IV.

Based upon the foregoing, the undersigned concludes that remand is appropriate in this matter because there is insufficient evidence to support the ALJ's decision.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner to deny Plaintiff DIB and SSI benefits be **REVERSED**, and this matter be **REMANDED** under sentence four of 42 U.S.C. § 405(g).

On remand, the Commissioner shall obtain testimony and evaluation from a medical expert in order to reevaluate the weight to be given to the opinions of Ms. Satterthwaite, Dr. Kocian-Figueroa, and Dr. Khan, and to provide an accurate RFC assessment. Additionally, the Commissioner's hypothetical question to the vocational expert shall accurately portray Plaintiff's impairments and limitations.


Date:  June 29, 2009                         s/ Timothy S. Black
                                             Timothy S. Black
                                             United States Magistrate Judge

| | | |
|---|---|---|
| SHANNON MANUS, | : | Case No. 1:08-cv-243 |
| | : | |
| Plaintiff, | : | Judge Herman J. Weber |
| | : | Magistrate Judge Timothy S. Black |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **TEN DAYS** after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to **THIRTEEN DAYS** (excluding intervening Saturdays, Sundays, and legal holidays) when this Report is being served by mail and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  A party may respond to another party's objections within **TEN DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).